IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 17, 2001

## STATE OF TENNESSEE v. BENJAMIN HERNANDEZ, III

**Direct Appeal from the Criminal Court for Putnam County**
**No. 97-0174    Leon C. Burns, Jr., Judge**

_____

**No. M2000-00225-CCA-R3-CD - Filed November 21, 2001**

_____

The defendant was indicted for premeditated first degree murder, convicted of the lesser-included offense of second degree murder, and sentenced to 25 years in the Department of Correction. In this appeal, the defendant alleges: (1) the evidence was insufficient to sustain his conviction; (2) the state failed to provide him with exculpatory evidence; (3) the state destroyed evidence, thereby depriving him of due process; and (4) the trial court erroneously failed to grant a continuance or mistrial when a witness became ill and was unavailable to testify. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Michael H. Knowlton (at trial and on appeal) and Joseph F. Edwards (at trial), Cookeville, Tennessee, for the appellant, Benjamin Hernandez, III.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; William Edward Gibson, District Attorney General; and David A. Patterson and Benjamin W. Fann, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### TRIAL TESTIMONY

Nina Turner testified she had a good relationship with her fiancee, Danny Johnson, the victim. On December 31, 1996, she and the victim went to two friends' residences. She stated the victim consumed alcohol at both residences. She and the victim began arguing concerning her desire to return home, so she dropped the victim off at a bar at approximately 10:40 p.m. She then proceeded home and went to bed. At approximately 1:30 a.m., she received a phone

call from the victim requesting her to pick him up at the bar. When she refused his request, he threatened to burn her home.

In response to his threat, Turner left with her mother and children, who also resided there, and went to the justice center to obtain a warrant. Turner stated she was denied the warrant because she was not the legal owner of the residence, and her mother refused to enter the building because "she did not have her teeth." They left the justice center and drove to a gas station where Turner phoned the victim, who refused to talk with her. They drove to her sister's residence, arriving at approximately 2:30 a.m., and spent the night. Turner, her children, and her mother returned to their residence at approximately 7:00 a.m. and found the side door open. Upon entering, they saw the victim's body on the floor and phoned the police. The autopsy revealed the victim suffered multiple gunshot wounds.

Turner further testified the victim was a friend of David Leonard, Robert Leonard's older brother. She stated she was not close to either, "did not care" for Robert, and had never dated or had a sexual encounter with either.

Robert Leonard testified he was acquainted with the defendant and the victim. He described the defendant as his friend, but stated the defendant and the victim were not friends. He testified that on December 31, 1996, he, the defendant, and Patricia Blackman, the defendant's girlfriend, attended a party until approximately 12:15 a.m., when they went to Leonard's residence. The victim phoned approximately 15 minutes after their arrival, and Leonard's girlfriend chastised him for phoning so late because of a sleeping child. The victim phoned again within three minutes. The defendant answered, stating, "[Y]ou disrespected me, [and] I know where you live, and I'll go kick your a--." The defendant then hung up and stated, "Let's go over there." Leonard testified the defendant then drove him, his younger brother Timothy Leonard, Timothy Leonard's friend Eric Dishman, and Blackman to Nina Turner's residence, where the victim was located.

The defendant, followed by Robert and Timothy, walked up the stairs to the residence's side door while Blackman and Dishman remained in the vehicle. The defendant then knocked on the door, and, although the refrigerator was partially barricading the door, the victim opened it slightly, holding a knife, and said, "It's you, punk." The victim then moved the refrigerator to the side, opened the door, and the defendant fired three or four shots. The trio then fled to the vehicle, and the defendant argued with Blackman, stating he thought she and Dishman were engaged in sexual activity, and he "would shoot [Dishman] and he didn't care because he'd just shot a man."

Robert Leonard further testified the defendant refused to drive them home, instead taking them to his residence. There, the defendant consumed more alcohol and argued with Blackman, who ran outside of the residence and yelled that the defendant had just committed a murder. The defendant followed her outside and hit her. When the defendant returned, he hid the gun in the air conditioning vent; however, he later instructed Dishman to remove it

since Dishman's hands were of the size that could reach inside the duct work. Robert recognized the pistol as the one his father kept in the arm of the recliner at the Leonard residence.

Robert Leonard further stated that on a later date the defendant got in an argument and bragged that he was "not worried about killing someone else; [because] he killed somebody." Furthermore, Robert testified the defendant confessed to Robert's father that he killed the victim.

TBI Forensic Agent Don Carmon testified he conducted ballistics testing on bullet fragments and cartridge casings recovered from the scene. Carmon testified the cartridge casings were consistent with the bullet fragments. On cross-examination, Carmon stated a latent fingerprint analysis was not requested on the casings, and such an examination would ordinarily be done prior to his ballistics testing.

Timothy Leonard testified he was 15 years old at the time of the victim's death, and he and Eric Dishman were at the Leonard residence on December 31, 1996. At approximately 1:00 a.m., Robert Leonard, Blackman, and the defendant entered the residence. The victim called, and the defendant talked with him. Timothy testified the defendant said the victim "disrespected" him, and the defendant told the victim, "I'll kill you, or I'll whip you."

Timothy Leonard further stated the defendant then drove him, Dishman, Robert, and Blackman to the residence where the victim was located. He and Robert exited the vehicle and followed the defendant to the side door of the residence, while Dishman and Blackman remained in the vehicle. The victim and the defendant briefly exchanged words, and the defendant fired five or six shots. They then proceeded to the defendant's residence, and, while driving, the defendant pointed the weapon at Dishman accusing him of "doing something" with Blackman while the defendant was out of the car. Timothy further corroborated Robert's testimony concerning the defendant's placement of the weapon in the air conditioning duct. Timothy additionally stated the defendant threatened to kill him if he informed anyone of the murder.

Eric Dishman testified he was 14 years old at the time of the shooting. He stated the defendant was angry when talking on the phone at the Leonard residence; they drove to the victim's residence; he heard gunshots; the defendant threatened to kill him if he told anyone he shot the victim; and the defendant threatened to kill him if he was "messing with [his] girlfriend."

Bryce Dallas testified the defendant threatened him on January 10, 1997, stating "he'd already killed once recently and that it wouldn't bother him to kill again."

Michael Gregory, an inmate in the Putnam County Jail, testified he met the defendant in jail in January 1997. He further testified the defendant stated he shot the victim because the victim "disrespected" him.

The defense offered the testimony of Karen Dubree, Sharon Norton, Reba Sanders, and the defendant.

Karen Dubree testified she and her boyfriend had a New Year's Eve party and were drinking with the victim. Nina Turner accompanied the victim but was not drinking. Dubree stated Turner was angry with the victim because "she didn't want to be with him [and] [s]he had other plans that did not include him." Dubree further testified Turner requested to leave the victim at her residence, and when she refused, Turner said she would shoot the victim if she had a gun. Dubree described the victim and Turner's relationship as "love/hate," and the victim "tormented her."

Sharon Norton testified that while at Dubree's New Year's Eve party, Turner "told [her] about how [the victim and she] had been fighting, and . . . if her father would have let her have a gun that he owned, she would have shot [the victim]." Norton further stated Turner wanted to leave the victim at the party and go to Robert Leonard's house.

Reba Sanders, Turner's cousin, was her neighbor in 1996. She testified Turner told her at some time prior to the homicide that the victim, while drunk, knocked down her door, choked her and caused a bruised eye and red marks on her throat.

The defendant testified he went to Robert Leonard's house on New Year's Eve, and Robert told him about his sexual relationship with Turner. Robert further told him Turner disliked the victim. After their discussion, the defendant and Robert left the residence in search of Turner and beer. While driving, they saw Turner's car at a gas station, stopped, and Robert talked with her.

Subsequently, the defendant and Robert picked up Blackman and eventually wound up at Robert's residence. The defendant testified the victim phoned the residence. Robert then gave the phone to the defendant, telling him to "[t]ry and calm [the victim] down." Although their conversation began in a friendly manner, the victim stated, "I know he's sleeping with her" and began cursing the defendant, so the defendant gave the phone to Robert. Robert and the victim argued and "cuss[ed]" at each other, and Robert stated, "[T]hat mother- f----r hung up on me." Robert then called the victim, they argued, and "there was more cussing." According to the defendant, Robert then hung up the phone, stating, "I'll show him. I'll fix him."

The defendant testified Robert then got his father's gun, removed the bullets, replaced the bullets, and requested the defendant to take him to the victim's house. The defendant, Blackman, Dishman, Robert, and Timothy then went to the residence. Upon arrival, Robert,

-4-

Timothy, and the defendant exited the vehicle; Robert knocked on the door; and Robert informed the victim they "need[ed] to talk." The defendant stated he then looked toward the vehicle and thought he saw Blackman and Dishman engaging in sexual activity. As he hollered at her, he heard gunshots; then he, Timothy, and Robert got back in the vehicle. The defendant testified Robert shot the victim.

The defendant conceded they returned to his residence where he helped hide the weapon, and he had to get "rough" with Blackman when she went outside screaming about the shooting. The defendant conceded he took the gun to Indianapolis "to get rid of [it]," but denied that he told fellow inmate Gregory he shot the victim.

Based on this evidence, the jury convicted the defendant of second degree murder.


## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends the evidence was insufficient to support his conviction. We disagree.

### A. Standard of Review

When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the findings by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence or a combination of direct and circumstantial evidence. State v. Brewer, 932 S.W.2d 1,18 (Tenn. Crim. App.1996). In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn.1978). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Tuttle, 914 S.W.2d 926, 932 (Tenn. Crim. App.1995).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence as well as all factual issues raised by the evidence. Id. In State v. Grace, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

### B. Analysis

Robert and Timothy Leonard both testified they witnessed the defendant shoot the victim. Eric Dishman testified the defendant threatened to kill him if he told anyone he shot

the victim. Bryce Dallas testified the defendant threatened him, stating he had recently killed and would kill again. Furthermore, Michael Gregory testified the defendant confessed to the shooting. Although the defendant denied shooting the victim, it is well within the province of the jury to determine witness credibility. State v. Oody, 823 S.W.2d 554, 558 (Tenn. Crim. App. 1991). Viewing the evidence in a light most favorable to the state, the evidence was more than sufficient to support the conviction.

## II. EXCULPATORY EVIDENCE

The defendant contends the state failed to provide him with a security video obtained from a local motel which may have contained conversations of the victim on the phone shortly before he was killed. The state contends the issue is waived because the defendant failed to timely file a motion for new trial.

### A. Motion for New Trial

A motion for new trial "shall be made . . . within thirty days of the date the order of sentence is entered." Tenn. R. Crim. P. 33(b). This provision is mandatory, and the time for filing may not be extended. See Tenn. R. Crim. P. 45(b); see also State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997); State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989). The thirty (30) day provision is jurisdictional, and an untimely motion is a nullity. Dodson, 780 S.W.2d at 780. It deprives the appellant of the opportunity to argue on appeal any issues that should have been raised in the motion for new trial. Martin, 940 S.W.2d at 569. Furthermore, the untimely filing of a motion for new trial does not toll the time for filing a notice of appeal; thus, an untimely motion for new trial will also result in an untimely notice of appeal. See State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987). Unlike the untimely filing of the notice of appeal, this court does not have the authority to waive the untimely filing of a motion for new trial. See Tenn. R. App. P. 4(a); State v. Givhan, 616 S.W.2d 612, 613 (Tenn. Crim. App. 1980). However, this court, in its discretion, may take notice of plain error which affects a substantial right of the defendant where it may be necessary to do substantial justice. Tenn. R. Crim. P. 52(b); State v. Johnson, 980 S.W.2d 414, 418 (Tenn. Crim. App. 1998).

### B. Analysis

The judgment was entered October 29, 1998, and the motion for new trial was not filed until December 16, 1998, clearly beyond the 30-day requirement. The issue is waived. Furthermore, we are unable to find plain error under Tenn. R. Crim. P. 52(b).

During a jury-out conference, the Assistant District Attorney General stated the tape was viewed by law enforcement, and they determined it contained nothing pertinent to the case. The officers had returned the tape to the motel, and the Assistant District Attorney General stated the tapes were "probably in [the motel's] possession." There is no indication

a request was made or subpoena issued by the defendant for the tape. Similarly, at the motion for new trial, there was no indication that the defendant requested or subpoenaed the tape from the motel. Nor is there any indication the defendant sought testimony at that hearing from the officer who viewed the tape. Obviously, the tape is not in the record for our review. We are unable to speculate as to the contents of the tape. Certainly, there is no showing of plain error. *See* State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (requiring that the record clearly establish what occurred in the trial court, and a breach of a clear and unequivocal rule of law in order to establish plain error). This issue is without merit.

## III.  DESTRUCTION OF EVIDENCE

The defendant alleges the state's ballistics testing of the bullet casings, subsequent to his request for fingerprint analysis, constituted illegal destruction of evidence. Specifically, he contends his due process rights were violated because the ballistics testing destroyed the ability to conduct any further fingerprint analysis. The state again argues the issue is waived for failure to file a timely motion for new trial. However, this issue is not waived because if it were sustained, it would result in dismissal of the case. *See* State v. Electroplating, Inc., 990 S.W.2d 211, 220 (Tenn. Crim. App. 1998) (noting Tenn. R. App. P. 3(e) waiver does not apply when the issue, if meritorious, would result in dismissal of the prosecution). We, therefore, address the issue on its merits.

### A.  **Ferguson** Requirements

The state has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16. State v. Ferguson, 2 S.W.3d. 912, 917 (Tenn. 1999). Once it is determined the state failed in its duty to preserve evidence, we must consider the following factors to determine the consequences of the breach: "(1) [t]he degree of negligence involved; (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) [t]he sufficiency of the other evidence used at trial to support the conviction." *Id.* The primary objective is to protect the defendant's right to a "fundamentally fair trial." *Id*.

### B.  Failure to Preserve Bullet Casings

We must initially determine whether the state, in fact, failed to preserve the evidence. Although it may be the state's handling of the casings made it impossible for a subsequent fingerprint analysis, the record does not necessarily establish this. A chronological examination of the record before us is appropriate.

Defendant filed a motion on August 12, 1997, requesting the state to perform a fingerprint analysis on the bullet casings. Although the motion was apparently heard on February 26, 1998, no such transcript is in the record. On March 6, 1998, the trial court

entered an order referring to the February 26th hearing and ordered the state to "provide the defendant's experts copies of all fingerprints taken from the crime scene. . . for independent analysis." On May 14, 1998, defendant filed a motion requesting state payment of expert fees for "Gary W. Jones, an expert in fingerprint analysis." No order relating to this request is in the record.

On May 22, 1998, defendant filed a motion to suppress and/or dismiss alleging the District Attorney's office failed to advise the officer to request a fingerprint analysis, and the "evidence was destroyed." The motion refers to an attached crime laboratory ballistics report; however, that report is silent as to whether fingerprint analysis would still be possible. No order regarding this motion appears in the record.

Just prior to the beginning of the jury trial on September 1, 1998, defense counsel brought the motion to the attention of the trial court, stating it had not been heard. Upon being questioned by the trial court as to whether he had any indication the casings would have detectable fingerprints, defense counsel said the state's ballistics expert should be able to testify "whether or not there would still be any proof that there was anything on there." The state argued a fingerprint analysis would not be exculpatory even if defendant's prints were not present and someone else's were.

Thereafter, during his trial testimony, the ballistics expert testified a fingerprint analysis was not requested. When defense counsel asked if a fingerprint analysis could be performed after the ballistics testimony, the expert stated,

> You would have to ask the latent examiner. I'm not sure if it would be viable to do so or not. I would imagine they would have to take elimination prints from me and some others.

Neither defense counsel nor the state asked any further questions, and the witness was excused. No further testimony was introduced relating to the viability of securing a fingerprint analysis.

Based upon the record before us, we are unable to conclude evidence has been destroyed, and are unable to necessarily conclude it was impossible to obtain a fingerprint analysis. Although this may be the case, defendant has not cited us to any portion of the record which clearly establishes this impossibility. *See* Tenn. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997) (noting failure to make appropriate references to the record ordinarily waives the issue).

Nevertheless, we note the state did not raise this point at trial or on this appeal. We elect to address the issue on its merits.

## C. Analysis of Ferguson Factors

We first address the degree of negligence involved. *See* Ferguson, 2 S.W.3d at 917. The defendant specifically requested the fingerprint analysis by motion filed in August 1997. It appears the District Attorney's office was negligent in not adequately communicating to the officer to request the analysis; however, there is no evidence of bad faith. In fact, unsuccessful efforts were made at the crime scene to secure fingerprints in the kitchen. We conclude the state was guilty of simple negligence, as opposed to gross negligence. *See id.* at 918 (finding simple as opposed to gross negligence).

Next, we apply Ferguson factor two, requiring a determination of the degree of significance of the destroyed evidence. *See id.* at 917. The defendant contends the spent shell casings might have Robert Leonard's fingerprints on them, which would be consistent with defendant's testimony. Even if the defendant is correct in his assumption, the presence of Robert Leonard's fingerprints on the bullet casings would not be determinative. It is undisputed the weapon belonged to Leonard's father, with whom Robert resided. It was the state's theory that the defendant got the pistol from the recliner at the Leonard residence. The state did not endeavor to prove the defendant loaded the pistol. There was also testimony that Leonard's father allowed family members and guests to use his weapons. The presence of Robert Leonard's fingerprints would be probative as to the person who at some time loaded the pistol, but not necessarily probative as to the person who shot the victim. In short, the presence of Leonard's prints on the casings would not exonerate the defendant.

Finally, we apply Ferguson factor three, requiring a determination of the sufficiency of the remaining evidence. *See id.* The evidence of the defendant's guilt was indeed strong. Robert and Timothy Leonard testified they witnessed the defendant shoot the victim; Eric Dishman testified he heard the shots, and the defendant threatened to kill him if he told anyone he shot the victim; Bryce Dallas testified the defendant threatened him on January 10, 1997, stating he had recently killed someone and would do it again; and inmate Michael Gregory testified the defendant confessed to the shooting. This factor does not favor dismissal.

We conclude there was no showing of fundamental unfairness, and dismissal of the case was not warranted. This issue is without merit.

## IV. CONTINUANCE / MISTRIAL

The defendant contends the trial court erroneously failed to grant a continuance or declare a mistrial when a witness became ill, hospitalized, and unavailable to testify.

Alice Pearl Goolsby, Nina Turner's mother and a subpoenaed defense witness, became ill in court during the state's case-in-chief. She was then taken to the hospital and was unavailable to testify for the remainder of the proceedings. The defendant argued her

-9-

testimony would have shown inconsistencies in Turner's testimony regarding Turner's relationship with the victim. The defendant also argued Goolsby's testimony would show Turner had a motive to kill the victim, or have him killed, because she did not have a good relationship with the victim. The trial court concluded the testimony was not material to the case.

First, we note this issue is waived because the defendant failed to file a timely motion for new trial. *See* Tenn. R. App. P. 4(a); Givhan, 616 S.W.2d at 613. However, we choose to review this issue to determine if plain error has affected a substantial right of the defendant. Tenn. R. Crim. P. 52(b); Johnson, 980 S.W.2d at 418.

The granting or denial of a continuance is a matter left to the discretion of the trial judge, whose decision will not be disturbed absent a clear showing of gross abuse of this discretion to the prejudice of the defendant. State v. Hurley, 876 S.W.2d 57, 65 (Tenn. 1993). Likewise, a reviewing court will not overturn a denial of a mistrial absent an abuse of discretion. State v. Brown, 53 S.W.3d 264, 284 (Tenn. Crim. App. 2000).

We find no abuse of discretion here and no plain error. Other witnesses testified about Turner's "love/hate" relationship with the victim. We have further reviewed Goolsby's pre-trial statement upon which defendant relies and find nothing significant that would have affected the outcome of the trial. This issue lacks merit.

## CONCLUSION

Based on the foregoing, we affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE

-10-